302 P.3d 651

**MENDOTA INSURANCE COMPANY, Plaintiff/Appellant,**

v.

**Eric GALLEGOS, Defendant/Appellee.**

**No. 1 CA–CV 12–0251.**

Court of Appeals of Arizona, Division 1, Department B.

May 7, 2013.

Burch & Cracchiolo, P.A. by Bryan F. Murphy and Daryl Manhart and Laura Meyer, Phoenix, Attorneys for Plaintiff/Appellant.

Law Office of Lawrence K. Lynde by Lawrence K. Lynde, Phoenix, Attorney for Defendant/Appellee.

## OPINION

NORRIS, Judge.

¶ 1 Plaintiff/Appellant Mendota Insurance Company appeals from the superior court's ruling that Defendant/Appellee Eric Gallegos was entitled to underinsured motorist coverage under an insurance policy it issued to Eric's brother, Martin. In ruling for Eric, the court found Eric was a "resident" of Martin's "household" at the time he was involved in an automobile accident and, thus, was an insured under Martin's policy. Because the superior court considered all of the relevant aspects of Martin's living arrangements and his familial relationship with Eric, we affirm the superior court's coverage ruling.

## FACTS AND PROCEDURAL BACKGROUND

¶ 2 Eric and Martin, both in their twenties, are the adult sons of Bertha ("Mother"). At all relevant times, Eric lived with Mother and her husband, his step-father, in their home in Peoria, Arizona ("Peoria home"). Martin slept in the Peoria home, "every single night" for approximately four years until January 2009, when he rented a room at a friend's house ("rental house") because he "was kind of wanting to party and . . . have some fun," and he could not "really party at [the Peoria home]." Martin and his friend agreed Martin would pay $300 per month in rent and half of the utility costs. Martin moved his bed and some clothes to the rental house, but maintained a room in the Peoria home and kept personal belongings and furniture there. Martin testified that although he had no specific timeline in mind, he "had always intended at some point in time to move back in with [his] parents" and would eventually do so "whenever [he] was done [partying]."

¶ 3 Shortly after moving into the rental house, Martin began to spend a significant amount of time with his girlfriend at her apartment. Although Martin stayed "five out of seven of the nights" at her apartment, Martin's girlfriend did not consider him as "actually living with her," because they had not yet been dating for a year and Martin had not started "paying bills" at her apartment. Meanwhile, Martin continued to pay his friend rent, and to spend time at the Peoria home, where he had sit-down meals with Mother and Eric on the weekends, did laundry, and received his mail. Martin described his living arrangement as "back and forth" between the three places: the Peoria home, the rental house, and his girlfriend's apartment. Although Martin, Mother, and Eric gave varying estimates of the percentage of time Martin spent at the Peoria home when he was not at work—about 15% of the time according to Martin, 15–20% according to Mother, and 30–40% according to Eric—it is fair to say Martin spent the majority of his time at his girlfriend's apartment, some time at the rental house, and some time at the Peoria home.

¶ 4 On September 8, 2009, with Mother's help, Martin applied for an automobile insurance policy with Mendota through a broker, identifying the Peoria home as his residence in his application. The Mendota policy provided underinsured motorist ("UIM") coverage to Martin as the named insured and to the named insured's "family member[s]." The policy defined a "family member" as "a person related to [the named insured] by blood, marriage or adoption who is a resident of [the named insured's] household." The policy, however, did not define "resident" or "household."

¶ 5 On September 17, 2009, Eric was injured in an accident while riding in a friend's car. Subsequently, he filed a claim for UIM coverage under Martin's policy. On November 12, 2009, a Mendota representative interviewed Martin. In the interview, Martin stated he had been living in the rental house for about a year, but also explained he lived part-time in the Peoria home and would "go between both residences."

¶ 6 Subsequently, Mendota sued Eric, seeking a declaration that he was not a resident of Martin's household. After a bench trial, the superior court denied Mendota's request for declaratory relief and concluded the facts weighed in favor of finding that at the time of the accident, "Eric was a resident of Martin's household."

## DISCUSSION

¶ 7 The issue on appeal is whether Eric, at the time of the accident, was a "resident of [Martin's] household" for the purpose of receiving coverage under the UIM provisions of the Mendota policy. Resolution of this issue requires a two-part inquiry: first, where was Martin's household, and second, was Eric a resident of that household.

¶ 8 Interpretation of an insurance contract—including the meaning of the terms "household" and "resident"—involves a question of law we review de novo. *Sparks v. Republic Nat'l Life Ins. Co.*, 132 Ariz. 529, 534, 647 P.2d 1127, 1132 (1982). When contract terms have settled meanings, whether a person meets the contractual requirements for insurance inclusion or exclusion raises a question of fact, and Arizona courts have consistently viewed a person's membership or residency in a household as involving a factual inquiry. *Mid–Century Ins. Co. v. Duzykowski*, 131 Ariz. 428, 430, 641 P.2d 1272, 1274 (1982) (whether child was "resident of the same household" for coverage inclusion was question of fact); *State Farm Mut. Auto. Ins. Co. v. Novak*, 167 Ariz. 363, 369, 807 P.2d 531, 537 (App. 1990) (whether child "lived with" parents for coverage inclusion was question of fact); *Heard v. Farmers Ins. Exch. Co.*, 17 Ariz. App. 193, 195, 496 P.2d 619, 621 (1972) (whether child was resident of step-father's household for coverage exclusion was factual determination). Accordingly, we accept the superior court's factual findings unless they are clearly erroneous, i.e., not supported by substantial evidence. *Kocher v. Ariz. Dep't of Revenue*, 206 Ariz. 480, 482, ¶ 9, 80 P.3d 287, 289 (App.2003) (appellate court will sustain superior court's factual finding unless clearly erroneous; factual finding is not clearly erroneous "if substantial evidence supports it").

### I. Household

¶ 9 As discussed, the initial issue here is where was Martin's "household." [1] On appeal, Mendota argues Martin did not maintain a household at the Peoria home because he spent more time living elsewhere, his visits to the Peoria home were "sporadic, occasional, and temporary," and he was not living there at the time of Eric's accident. Essentially, Mendota's argument focuses solely on the physical presence aspect of a household. As we explain, this argument does not take into account the totality of the circumstances that demonstrate the existence of a household.

¶ 10 In construing identical or similar policy provisions in insurance contracts, this court has defined the term "household" as "those who dwell under the same roof and compose a family"; "a domestic establishment" and "a social unit comprised of those living together in the same dwelling place"; "a collection of persons as a single group, with one head, living together, a unit of permanent and domestic character, under one roof." *State Farm Mut. Auto. Ins. Co. v. Johnson*, 151 Ariz. 591, 593, 729 P.2d 945, 947 (App.1986) (citations omitted); *Nationwide Mut. Ins. Co. v. Granillo*, 117 Ariz. 389, 392–93, 573 P.2d 80, 83–84 (App.1977) (citation omitted); *Heard*, 17 Ariz.App. at 196, 496 P.2d at 622 (citation omitted).

¶ 11 Our definitions are consistent with how courts in other jurisdictions describe a "household." *E.g.*, *Cicciarella v. Amica Mut. Ins. Co.*, 66 F.3d 764, 768–69 (5th Cir. 1995) ("The word 'resident' embodies the concept of *place*, connoting the physical or geographical location or locale where individuals dwell or reside. On the other hand, the word 'household' (as distinguished from 'house,' 'residence,' 'abode,' and the like), is universally defined in terms of *persons*—an

---

1. Mendota asserts the superior court found the term "household" ambiguous even though Arizona courts have held the phrase "resident of the same household" is not ambiguous. *See infra* ¶ 23. We disagree with Mendota's characterization of the record. While the superior court stated the term "household" can be understood "in many shades of gray in today's world," it applied the word's ordinary meaning, consistent with "what most people think of as their household." The court acknowledged it would "accept the definition [of household] that's fairly broad in the case law," and observed case law—which has primarily focused on the "resident" part of the phrase instead of the "household" part—does not squarely address what factors should be considered in determining the insured's household. *See infra* ¶ 15.

agglomeration of individuals who dwell as a unit under one roof.") (emphasis in original); *Kepple v. Aetna Cas. & Sur. Co.*, 634 So.2d 220, 222 (Fla.Dist.Ct.App.1994) ("three material aspects of a 'household' are (1) close ties of kinship, (2) a fixed dwelling unit, and (3) enjoyment of all living facilities").

¶ 12 As recognized in the definitions above, a household shares at least three attributes. First, a household contemplates a close-knit group of individuals who treat each other like family, and deal with each other intimately and informally. *Johnson*, 151 Ariz. at 593, 729 P.2d at 947 (quoting *Pamperin v. Milwaukee Mut. Ins. Co.*, 55 Wis.2d 27, 197 N.W.2d 783, 788–89 (1972)). A household, thus, requires the existence of a family unit.

¶ 13 Second, a household contemplates a connection to a shared dwelling place where its members develop and maintain their close-knit, intimate, and informal relationships. *Id.* at 593, 729 P.2d at 947 (spouses who never lived together did not establish a household; to establish a household, some "living together" must have occurred at some point in time). It is not essential, however, that household members must always be physically present and living under one roof. A person can explore living arrangements outside a common dwelling place and still maintain sufficient connection to it as a member of that household. *Granillo*, 117 Ariz. at 392–94, 573 P.2d at 83–85 (despite geographical separation, wife remained member of husband's household; physical presence is not the sole or controlling test in determining membership in a household).

¶ 14 Third, a household contemplates a settled or permanent status; it requires a degree of permanency and intention to integrate into the family unit and remain a member for more than a mere transitory period. *Id.* at 393, 573 P.2d at 84 (wife did not become member of parents' household because she lived with them temporarily while relocating to a different town); *Farmers Ins. Co. of Ariz. v. Oliver*, 154 Ariz. 174, 178–80, 741 P.2d 307, 311–13 (App.1987) (child who stayed temporarily with grandparents due to father's injury, unemployment,

and small apartment was not resident of grandparents' household). Thus, a relative who lives in a home only on a temporary basis does not become a member of the household. *Granillo*, 117 Ariz. at 393, 573 P.2d at 84. Similarly, individuals who "reside together as roommates" do not constitute a household. *Shivvers v. Am. Family Ins. Co.*, 256 Neb. 159, 589 N.W.2d 129, 136 (1999).

¶ 15 Determining where an insured's household is thus requires an objective evaluation of the totality of the relationships between or among the individuals, their connection to a shared dwelling where they have developed and maintained those relationships, and the permanency and integration of the individuals into a family unit. Although, as noted, Arizona courts have described a household in discussing the meaning of the phrase "resident of the same household," they have focused on the claimant's residence, not on the named insured's household, and therefore, those cases are not directly on point. But the factors identified in those cases are nonetheless instructive and provide guidance in determining an insured's household. Such factors include: whether the individuals lived under the same roof, the nature and formality of their relationship, the intended duration of their relationship, their presence or absence on the date of the incident giving rise to the insurance claim, the reasons or circumstances explaining their presence or absence, prior living arrangements, their intent regarding their living arrangements, and the existence of a second place of lodging. *Mid–Century Ins. Co.*, 131 Ariz. at 430, 641 P.2d at 1274; *Oliver*, 154 Ariz. at 178, 741 P.2d at 311.

¶ 16 In addition to the *Mid–Century* and *Oliver* factors, in assessing whether intimate and familial relationships exist, a court may consider the extent and quality of the individuals' shared experiences, the level of emotional and financial commitment, the "particulars of their day-to-day" interactions, how they relate to each other and conduct themselves, and the reliance they place on each other for family services. *See Dunphy v. Gregor*, 136 N.J. 99, 642 A.2d 372, 378

(1994) (factors to determine "intimate familial relationship" in tort context).

¶ 17 Here, while the superior court found Martin was not living at the Peoria home "the majority of the time," it did not find this one factor determinative and considered other factors, such as Martin's intent, actions, where he kept "things of importance to him," and the alternative living arrangements he had with his friend and girlfriend. By considering the totality of the circumstances, the court applied the correct legal standard, and substantial evidence supports its finding that Martin's household was at the Peoria home.

¶ 18 Although at the time of Eric's accident, Martin lived in three different places and, as Mendota points out, spent most of his time with his girlfriend, he nonetheless maintained familial ties with Eric and Mother at the Peoria home. He clearly considered the Peoria home—rather than the rental house or his girlfriend's apartment—his home. He had lived at the Peoria home continuously for approximately four years until January 2009 when, as the superior court put it, he started to "strike out [with] . . . little steps" to be on his own. Martin listed the Peoria home on his driver's license and in his application for the Mendota policy. He received his mail at the Peoria home, not just for convenience purposes, but also because he considered the Peoria home "[his] home." As Martin explained, because he did not have a lease with either his friend or girlfriend, he "was free to leave anytime"; and if his friend or girlfriend became "unhappy" with him and "kick[ed][him] out," the Peoria home was the "one place" he could "always go and stay and know that all [his] stuff [was] there." Compared to the rental house, where he was "[j]ust a roommate," or his girlfriend's apartment, where he was an invited guest who had not officially "move[d] in," Martin shared the most lasting and enduring relationships with Eric and Mother at the Peoria home.

¶ 19 Mother also testified that "when Martin first began spending time at [the rental house]," he returned to the Peoria home three out of four weekends, and after Martin started dating, he would bring his girlfriend along. During Martin's weekend visits, the family would have sit-down meals, do laundry, watch their dogs play, and "just sit and talk and interact[ ]." Eric also testified that, while Martin did not often sleep at the Peoria home, he saw Martin around "[o]ften," at least "a few times a week," and they did things together "[a]ll the time." Thus, even though Martin spent more time at his girlfriend's apartment and the rental house than he did at the Peoria home, he continued to function as part of a domestic unit comprised of Eric and Mother and, with them, maintained the intimate familial relationships of a household.

¶ 20 Furthermore, Eric presented evidence of reliance and support between himself and Martin. Although they were "very different" in lifestyle and did not "talk as much as some brothers might," they had "a good relationship," "love[d] each other," and would "hang out" together. And, from time to time, Martin gave Eric rides because Eric did not have a car, and Eric would check if "everything [was] okay" between Martin and his girlfriend.

¶ 21 Although Martin moved out of the Peoria home to "have some fun," and gain independence, he did not sever his ties to the Peoria home. He maintained close, intimate, and familial relationships with Eric and Mother there, and maintained a household with them. Given the totality of the circumstances, the superior court did not abuse its discretion in finding Martin maintained his household at the Peoria home.

## II. Resident of the Household

¶ 22 The next issue is whether Eric was a resident of Martin's household at the time of the accident. According to Mendota, even if Martin maintained his household at the Peoria home, Eric was not a resident of that household because Eric did not have "a special relationship" with Martin, and Martin did not act as the head of the household as to Eric. We disagree.

¶ 23 Arizona courts have held "resident of the household" is unambiguous and have interpreted the phrase according to its ordinary meaning. *Oliver*, 154 Ariz. at 177–78, 741 P.2d 307, 310–11 (quoting *Mid–Century Ins. Co.*, 131 Ariz. at 430, 641 P.2d at 1274).

Whether a person is a resident of the named insured's household depends on the factors outlined in *Mid–Century* and *Oliver*, as discussed *supra* ¶ 15. "[N]o one [factor] is controlling, but all ... must combine to a greater or lesser degree." *Oliver*, 154 Ariz. at 178, 741 P.2d at 311. Here, in applying these factors, the superior court did not abuse its discretion in finding Eric was a resident of Martin's household.

¶ 24 At all relevant times, Eric lived at the Peoria home where, as discussed *supra* Part I, Martin maintained his household. Eric's presence in the Peoria home was permanent, consistent, and regular; he lived nowhere else and had no intention of living anywhere else. Although Martin was "in and out" of the Peoria home, Eric still had an intimate, informal relationship with him on an ongoing basis. Eric saw Martin "a few times a week" and they socialized in the Peoria home, had dinner together, watched TV and movies, and talked. Martin also gave Eric rides to "help [him] out." On this record, the superior court did not abuse its discretion in finding Eric was a resident of Martin's household.[2]

*III. Public Policy*

¶ 25 Mendota also argues public policy considerations preclude extending coverage to Eric because Martin did not disclose to the insurance broker Eric was a resident of his household and, thus, did not actually "contemplate" Eric would be entitled to coverage under his policy. Under the circumstances presented here, we disagree.

¶ 26 First, although the insurance broker testified it was her standard practice to ask applicants whether there were additional drivers in the household, and based on a notation she made on Martin's application— "a line through the additional drivers" section—she "assume[d]" Martin did not disclose that information to her, Martin testified to the contrary. Martin stated he "specifically remember[ed]" telling the broker that

"he stayed with [his] parents mostly," Mother was "the one that set [him] up" with the broker, and he had brothers. The superior court did not find the broker's testimony credible, and concluded she had not been thorough and careful in processing Martin's insurance application.

¶ 27 Second, as the superior court pointed out, the Mendota policy—which did not define "household" or "resident"—"did not do a very good job of capturing the real world," where young adults "maintain their anchor with their family home" as they transition from being primarily at home to starting to "strike out on their own [with] little steps at a time." Mendota could have drafted its policy to take into account this transitional process. It also could have required its brokers to more thoroughly explore applicants' household composition, especially when applicants, like Martin, may have non-traditional or complicated living arrangements.

¶ 28 While failure to define a term in a policy does not necessarily render that term ambiguous, an insurance company— should it wish to limit or restrict the meaning of terms such as household and resident— can easily do so by express language. *E.g.*, *Gibson v. Callaghan*, 158 N.J. 662, 730 A.2d 1278, 1286–87 (1999) (insurance company could limit meaning of household if it so wished). Especially when the phrase "resident of [the named insured's] household" can encompass a variety of arrangements, it is reasonable to expect an insurance company to draft that policy provision with more detail and precision to avoid uncertainty when applied to real-world situations.

**CONCLUSION**

¶ 29 For the foregoing reasons, we affirm the superior court's coverage ruling. As the successful party on appeal, we award Eric costs on appeal under Arizona Revised Statute ("A.R.S.") section 12–341 (2003), and rea-

---

2. Although Eric was also a resident of his Mother's household, this did not preclude him from being a resident of Martin's household as well, and Mendota does not argue to the contrary. *E.g., Arents v. Gen. Ace. Ins. Co.*, 280 N.J.Super. 423, 655 A.2d 936, 938–39 (N.J.Super.Ct.App.Div.1995) ("finding that a person is a resident of one household does not necessarily preclude, as a matter of law, that person's residence in another household"); *Londre by Long v. Cont'l W. Ins. Co.*, 117 Wis.2d 54, 343 N.W.2d 128, 131 (App.1983) (person may be resident of more than one household for insurance purposes).

sonable attorneys' fees under A.R.S. § 12–341.01(A) (Supp.2012), contingent on his compliance with Rule 21 of the Arizona Rules of Civil Appellate Procedure.

CONCURRING: ANDREW W. GOULD and RANDALL M. HOWE, Judges.