NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

## DIVISION ONE

SP SYNTAX LLC, a Delaware limited liability company; and SP3 SYNTAX LLC, a Delaware limited liability company, *Plaintiffs/Appellants*,

*v.*

FEDERAL INSURANCE COMPANY, an Indiana corporation, *Defendant/Appellee*.

No. 1 CA-CV 14-0638
FILED 3-3-2016

Appeal from the Superior Court in Maricopa County
No. CV2011-019071
The Honorable J. Richard Gama, Judge

**AFFIRMED**

COUNSEL

Perkins Coie LLP, Phoenix
By Todd R. Kerr
*Co-counsel for Plaintiffs/Appellants*

Perkins Coie LLP, Madison, WI
By Timothy W. Burns
*Co-counsel for Plaintiffs/Appellants appearing pro hac vice*

Susman Godfrey L.L.P., Los Angeles, CA
By Steven G. Sklaver, Marc M. Seltzer, Bryan J.E. Caforio
*Co-counsel for Plaintiffs/Appellants appearing pro hac vice*

Seltzer Caplan McMahon Vitek, San Diego, CA
By Michael G. Nardi, Robert H. Traylor
*Co-counsel for Defendant/Appellee appearing pro hac vice*

Broening Oberg Woods & Wilson PC, Phoenix
By Robert T. Sullivan, Kevin R. Myer
*Co-counsel for Defendant/Appellee*

---

**MEMORANDUM DECISION**

Judge Donn Kessler delivered the decision of the Court, in which Presiding Judge Peter B. Swann and Judge Lawrence F. Winthrop joined.

---

**K E S S L E R**, Judge:

**¶1**        In this appeal, we are asked to resolve an insurance coverage dispute between Appellants SP Syntax LLC and SP3 Syntax LLC (collectively "Silver Point"), as assignees of insured Syntax-Brillian Corporation ("SBC"), and Appellee Federal Insurance Company ("Federal"). The trial court found Federal was not obligated to provide coverage under two claims-made directors and officers ("D&O") policies for claims filed against SBC by Silver Point. For the reasons set forth below, we affirm.

### FACTUAL AND PROCEDURAL HISTORY

**¶2**        SBC was a publicly-traded developer and distributor of televisions. SBC purchased claims-made D&O insurance coverage through several different insurers. Two "towers" of coverage are relevant to this appeal. The first tower ("Tower 1") was effective from November 30, 2006 through November 30, 2007 and included $5 million policies from four different insurers. The second tower ("Tower 2") was effective from November 30, 2007 through November 30, 2008 and included five policies:

- $5 million in primary D&O coverage from National Union Fire Insurance Company of Pittsburgh, PA (the "National Union Primary Policy"),

2

- $5 million in excess "follow form" coverage above $5 million from Federal (the "Federal Excess Policy"),

- $5 million in excess "follow form" coverage above $10 million from Liberty Mutual Insurance Company,

- $5 million in Side A/Difference in Condition ("DIC") coverage above $15 million from Federal (the "Federal Side A Policy"),[1] and

- $5 million in Side A/DIC coverage above $20 million from XL Specialty Insurance Company.

I.     The Tsirekidze Action

¶3        SBC, its CEO, and its CFO were sued in a securities fraud class action on November 14, 2007 (the "Tsirekidze Action"). The Tsirekidze plaintiffs alleged that SBC had misrepresented its finances and operations in various public filings between May 2007 and October 2007. The Tsirekidze plaintiffs filed a consolidated complaint in August 2008 that added several SBC directors and officers as new defendants as well as new claims under federal securities laws. The consolidated complaint focused on alleged misrepresentations relating to three areas of SBC's business: price protection rebates and "tooling deposits" SBC paid to supplier Kolin and large balances allegedly owed to SBC by its Chinese distributor, SCHOT, for overseas sales. SBC tendered the Tsirekidze Action to the Tower 1 insurers, and there appears to be no dispute that the Tower 1 insurers accepted coverage.

II.     The Silver Point Action

¶4        Approximately three months after the Tsirekidze plaintiffs filed their consolidated complaint, Silver Point filed suit against several SBC directors and officers (the "Silver Point Action"), alleging that they had induced Silver Point to enter into and maintain a $250 million credit facility agreement with SBC (the "CFA") by making "false and misleading

---

[1] The Federal Side A Policy included a "drop down" endorsement under which "coverage otherwise afforded by this policy shall drop down and attach" if, for example, "the insurer(s) of the Underlying Insurance wrongfully refuse[d] in writing to indemnify any Insured Person for loss pursuant to the terms and conditions of such Underlying Insurance" or "pursuant to the terms and conditions of the Underlying Insurance, the insurer(s) of the Underlying Insurance [was] not liable for Loss, as that term is defined in this policy."

statements and omissions of material fact . . . regarding SBC's financial condition, results of operations, and management." The alleged false statements included all three categories of misrepresentations alleged in the Tsirekidze Action, which Silver Point alleged it received privately as opposed to via public filings as did the Tsirekidze plaintiffs.

¶5        Silver Point also alleged that SBC's directors and officers made additional misrepresentations after the Tsirekidze Action commenced, including (1) misrepresenting an alleged $40 million payment expected from SCHOT and (2) that SBC's officers stood behind the financial statements made in earlier public filings during a February 2008 board meeting. Silver Point alleged that it lost millions because it entered into and "refrain[ed] from exercising its contractual rights under the [CFA] with respect to its collateral" as a result of these misrepresentations.

¶6        SBC tendered the Silver Point Action to the Tower 1 and Tower 2 insurers. Each of the Tower 2 insurers denied coverage, including Federal, who denied coverage under both policies.

III.    Federal Denied Coverage for the Silver Point Action under the Federal Excess Policy

¶7        Federal denied coverage for the Silver Point Action under Endorsement No. 25 and Paragraph 4(d) of the National Union Primary Policy, of which the Federal Excess Policy follows form, as well as Section 7 of the Federal Excess Policy. Endorsement No. 25 of the National Union Primary Policy excluded coverage for any claim "alleging, arising out of, based upon, attributable to or in any way related directly or indirectly, in part or in whole, to an Interrelated Wrongful Act . . . regardless of whether or not such Claim involved the same or different Insureds, the same or different legal causes of action or the same or different claimants . . . ." Endorsement No. 25 also specifically references the Tsirekidze Action in its definition of "Interrelated Wrongful Act," which included "(i) any fact, circumstance, act or omission alleged in [the Tsirekidze Action] and/or (ii) any Wrongful Act which is the same as, similar, or related to or a repetition of any Wrongful Act alleged in [the Tsirekidze Action]." Any claim excluded by this Tsirekidze-specific endorsement would be deemed to have been first made under National Union's Tower 1 policy, when the Tsirekidze Action was first filed.

¶8        Paragraph 4(d) provides, in relevant part, that National Union, and therefore Federal, would not

4

> make any payment for Loss in connection with any Claim made against an Insured . . . alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related Wrongful Acts alleged or contained in any Claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time[.]

According to Federal, both provisions barred coverage because the Tsirekidze Action and the Silver Point Action arose out of similar factual allegations, including all three categories of misrepresentations highlighted in the Tsirekidze plaintiffs' consolidated complaint.

¶9            Section 7 of the Federal Excess Policy provides, in relevant part, that Federal would not be liable

> for any loss which is based upon, arises from or is in consequence of any demand, suit or other proceeding pending, or order, decree or judgment entered against any Insured on or prior to [November 30, 2007], or the same or any substantially similar fact, circumstance or situation underlying or alleged therein.

Federal contended this exclusion barred coverage because the Silver Point Action arose from "fact[s], circumstance[s] or situation[s] underlying or alleged [in the Tsirekidze Action]," which was filed on November 14, 2007.

IV.    Federal Also Denied Coverage for the Silver Point Action under the Federal Side A Policy

¶10           Federal also denied coverage under Section 7(c) of the Federal Side A Policy, which provides:

> All Related Claims shall be treated as a single Claim first made on the date the earliest of such Related Claims was first made, or on the date the earliest of such Related Claims is treated as having been made in accordance with Section 8(b)

below, regardless of whether such date is before or during the
Policy Period.[2]

Federal again relied on the factual similarities between the Silver Point
Action and the Tsirekidze Action, including the three categories of
misrepresentations alleged in the Tsirekidze Action consolidated
complaint, to deny coverage.

¶11 Federal also cited Section 4(a) of the Federal Side A Policy
which, like Section 4(d) of the National Union Primary Policy, excluded
coverage for any claim "based upon, arising from, or in consequence of any
fact, circumstance, situation, transaction, event or Wrongful Act that, before
the inception date [of November 30, 2007], was the subject of any notice
given under any policy or coverage section of which this policy is a direct
or indirect renewal or replacement[.]"  Federal contended this exclusion
applied because the Federal Side A Policy replaced a similar policy within
Tower 1, issued by another carrier, whom SBC alerted to the Tsirekidze
Action during the Tower 1 effective period.  Federal thus deemed the Silver
Point Action "to have been first made when the Tsirekidze Action was
made, on or about November 14, 2007."

V.     SBC Settled With and Assigned Its Rights under the Tower 2 Policies
       to Silver Point

¶12 After Federal denied coverage, Silver Point reached a
settlement with SBC's directors and officers that included a stipulated
judgment for $26,470,000 with a covenant not to execute.  The directors and
officers then assigned their rights under SBC's Tower 2 policies to Silver
Point. Silver Point filed suit against the Tower 2 insurers alleging that each
insurer breached its contract with SBC by denying coverage for the Silver
Point Action.

VI.    The Trial Court Ruled in Favor of Federal

¶13 The trial court resolved Silver Point's claim against Federal on
two dispositive motions.  Federal first moved to dismiss or for judgment on
the pleadings on Silver Point's claim under both policies, citing the
provisions discussed above.  The trial court dismissed Silver Point's claim

---

2 Section 8(b) states that a Claim is deemed to have been first made when
the insured either "becomes aware of circumstances which could give rise
to a Claim" or "receives a written request to toll or waive a statute of
limitations applicable to Wrongful Acts committed . . . before or during the
Policy Period" and gives written notice to Federal.

under the Federal Excess Policy, finding that Endorsement No. 25 of the National Union Primary Policy barred coverage because the Silver Point Action "arose from the same core financial misstatements" as the Tsirekidze Action. The trial court denied Federal's motion as to the Federal Side A Policy, finding that "the lack of reference to the [Tsirekidze Action] is an important difference in construing the Side A Policies' [sic] related acts and/or prior notice exclusions."

¶14        Federal and Silver Point then cross-moved for summary judgment. The trial court granted Federal's motion, finding that "the plain language of [the Federal Side A Policy] relates the [Silver Point Action] back to the [Tsirekidze Action]." The trial court also rejected Silver Point's contention that "the Side A Insurers and SBC mutually intended the Side A Policies to drop down and cover a claim related to the [Tsirekidze Action], or at the least . . . SBC reasonably expected those policies would do so." The trial court entered final judgment and awarded Federal reasonable attorneys' fees and taxable costs under Arizona Revised Statutes ("A.R.S.") sections 12-341 (2003) and 12-341.01(A) (Supp. 2015). Silver Point timely appealed. We have jurisdiction under A.R.S. § 12-2101(A)(1) (Supp. 2015).

## DISCUSSION

¶15        "The interpretation of an insurance contract is a question of law we review de novo." *Emp'rs Mut. Cas. Co. v. DGG & CAR, Inc.*, 218 Ariz. 262, 264, ¶ 9 (2008). We interpret insurance policies "according to their plain and ordinary meaning," *Messina v. Midway Chevrolet Co.*, 221 Ariz. 11, 14, ¶ 9 (App. 2008) (citation omitted), and try to "harmonize and give effect to all provisions so that none is rendered meaningless," *Am. Family Mut. Ins. Co. v. White*, 204 Ariz. 500, 504, ¶ 9 (App. 2003). We also strive to give policy provisions a practical and reasonable construction that supports the parties' intentions. *Allstate Ins. Co. v. Powers*, 190 Ariz. 432, 435 (App. 1997).

I. The Trial Court Correctly Dismissed Silver Point's Claim under the Federal Excess Policy

¶16        We review the dismissal of a complaint under Arizona Rule of Civil Procedure 12(b)(6) de novo.[3]  *Coleman v. City of Mesa*, 230 Ariz. 352, 355, ¶ 7 (2012).  We accept all well-pleaded facts as true and give Silver Point the benefit of all inferences arising therefrom.  *See Botma v. Huser*, 202 Ariz. 14, 15, ¶ 2 (App. 2002).  We will affirm the dismissal only if Silver Point would not have been entitled to relief under any facts susceptible of proof in its complaint.  *See Coleman*, 230 Ariz. at 356, ¶ 8.

        A.      The Tsirekidze and Silver Point Actions Are "Related" under the Terms of the Federal Excess Policy

¶17        Silver Point first contends the Silver Point Action and the Tsirekidze Action are not "related."  Citing *Arizona Property and Casualty Insurance Guaranty Fund v. Helme*, 153 Ariz. 129, 134 (1987), Silver Point argues "[t]he term 'related' requires a 'causal connection with another act or omission,'" and that none of the private representations at issue in the Silver Point Action were "causally connected" to the public filings at issue in the Tsirekidze Action.

¶18        *Helme* is inapplicable to this case.  *Helme* was a medical malpractice case in which two doctors at the same professional corporation allegedly were independently negligent in not examining a patient's x-rays, leading to injury and death.  153 Ariz. at 131-32.  The insurance policy at issue insured the corporation and all of its employed doctors for up to $3 million per occurrence.  *Id.* at 132.  The Fund, taking over coverage from an insolvent insurer, maintained that the patient's injury constituted one "occurrence" under the policy, while the plaintiffs contended the doctors'

---

[3] The court may consider exhibits attached to the complaint without converting the motion to dismiss into a motion for summary judgment.  *See* Ariz. R. Civ. P. 10(c); *Vortex Corp. v. Denkewicz*, 235 Ariz. 551, 556, ¶ 17 (App. 2014) (stating a court may refer to a complaint's exhibits or public records without necessarily converting the Rule 12(b)(6) motion into one for summary judgment).  Silver Point attached copies of the following to its complaint:  all five Tower 2 policies (although some of the copies appear to be incomplete), the two Tsirekidze Action complaints, the Silver Point Action complaint, letters from each Tower 2 insurer denying coverage for the Silver Point Action, the settlement agreement resolving the Silver Point Action, and the stipulated judgment against the Silver Point Action defendants.

negligent acts constituted two separate occurrences. *Id.* The policy defined an occurrence to mean "any incident, act or omission, *or series of related incidents, acts or omissions* resulting in injury, " but did not define "related." *Id.* at 134. The court assumed "that the policy uses 'related' in its commonly accepted dictionary sense," and concluded that the term in that context meant a logical or causal connection between acts or omissions, and a "series of related acts" would be a single occurrence if the acts were causally related to each other as well as to the final result. *Id.* at 134-36; *see also DGG & CAR*, 218 Ariz. at 268 n.4, ¶ 25 (stating that *Helme* "simply concluded that two separate instances of malpractice . . . were separate occurrences because they were unrelated"). The court concluded that the two acts of alleged malpractice were separate occurrences. *Helme*, 153 Ariz. at 135-36. Here, however, the policy defined the term "related," making *Helme*'s analysis inapposite. *See Mendota Ins. Co. v. Gallegos*, 232 Ariz. 126, 132, ¶ 28 (App. 2013) ("[A]n insurance company—should it wish to limit or restrict the meaning of terms . . . can easily do so by express language.").

**¶19** Endorsement No. 25 of the National Union Primary Policy, of which the Federal Excess Policy follows form, provides the definition of "related" for resolving the claim under the excess policy. It excluded coverage for any claim "alleging, arising out of, based upon, attributable to or in any way related directly or indirectly, in part or in whole, to an Interrelated Wrongful Act," which in turn was defined to include "(i) any fact, circumstance, act or omission alleged in [the Tsirekidze Action] and/or (ii) *any Wrongful Act which is the same as, similar, or related to or a repetition of any Wrongful Act alleged in [the Tsirekidze Action]*." (Emphasis added.) The question, therefore, is whether the Silver Point Action is similar to or arose out of the same "core financial misstatements" that brought about the Tsirekidze Action. *See Fimbers v. Fireman's Fund Ins. Co.*, 147 Ariz. 75, 77 (App. 1985) ("The term arising out of . . . is ordinarily understood to mean originating from, having its origin in, growing out of or flowing from or in short, incident to or having connection with . . . ." (citation omitted) (internal quotation marks omitted)). Although the policy did not define "similar," a common definition is "[r]esembling without being identical," such as "a soft cheese similar to Brie." Oxford Dictionaries, www.oxforddictionaries.com/definition/american_english/similar (last visited Feb. 10, 2016).

**¶20** We agree with the trial court that the allegations in the SBC complaint arose out of or are similar to the allegations in the Tsirdkidze Action. The Tsirekidze plaintiffs alleged that SBC's directors and officers misrepresented price protection rebates and "tooling deposits" paid to supplier Kolin as well as large balances allegedly owed to SBC by its

Chinese distributor, SCHOT. Silver Point included all of these misrepresentations in the Silver Point Action complaint, and alleged that these misrepresentations caused it to enter into the CFA. Silver Point's claim clearly arose out of or is similar to the "Interrelated Wrongful Acts," as expressly defined by the policy, such that Endorsement No. 25 applied.

¶21 Silver Point urges us to follow *Financial Management Advisors, LLC v. American International Specialty Lines Insurance Co.*, 506 F.3d 922 (9th Cir. 2007). There, the Ninth Circuit found two lawsuits filed against an investment firm did not "aris[e] out of the same or related Wrongful Acts" under the firm's claims-made insurance policies because the lawsuits were brought by different clients who had made different investments based on different alleged misrepresentations. *Id.* at 923-26. *Financial Management* is distinguishable because Endorsement No. 25 specifically referenced the Tsirekidze Action and excluded coverage for any claim that arose out of or "based upon . . . in part or in whole . . . any Wrongful Act which is the same as, similar or related to or a repetition of any Wrongful Act alleged" therein. As discussed above, the Silver Point Action was based in large part on the same or similar "Wrongful Acts" that were at issue in the Tsirekidze Action.

¶22 The other two out-of-state cases on which Silver Point relies are distinguishable as well. In *Sigma Financial Corp. v. American International Specialty Lines Insurance Co.*, the underlying claims presented for coverage involved the sale of "different purchasers of different types of security product at different times." 200 F. Supp. 2d 697, 706 (E.D. Mich. 2001), *reconsideration granted in part on other grounds*, 200 F. Supp. 2d 710 (E.D. Mich. 2002). Likewise, in *ACE American Insurance Co. v. Ascend One Corp.*, the court found that a private lawsuit seeking monetary damages and a governmental investigation into consumer protection violations were sufficiently different in both time and scope that they did not arise out of "interrelated wrongful acts." 570 F. Supp. 2d 789, 800-01 (D. Md. 2008). Neither case involved an endorsement like Endorsement No. 25 that excluded coverage for claims that arose out of or were similar to claims in a specifically-named prior action.

      B.      Silver Point's Additional Allegations Do Not Differentiate the Silver Point Action from the Tsirekidze Action

¶23 Silver Point next highlights its allegations that were not at issue in the Tsirekidze Action, including that (1) it heard the misrepresentations in private conversations with SBC's directors and officers, (2) it relied on an additional misrepresentation regarding a $40 million payment allegedly owed by SCHOT, and (3) SBC's officers and

directors continued to make misrepresentations at a February 2008 board meeting after the Tsirekidze Action had commenced. Endorsement No. 25 is not limited to claims *identical* to the Tsirekidze Action; it applied to any claim "arising out of . . . or in any way related . . . in part or in whole" or similar to the Tsirekidze Action allegations.

**¶24** Nowhere in the complaint did Silver Point allege that new representations were made which were dissimilar from the Tsirekidze Action resulting in a second loan. Rather, Silver Point alleged that as a result of false and misleading statements and omissions of material fact, it was induced to loan SBC $130 million based on a "$250 million senior secured credit facility agreement, pursuant to which SBC was granted a $100 million revolving loan that was not funded and undrawn at the close of the financing, and a $150 million term loan that was fully funded at the close." The complaint described those misrepresentations and omissions as involving the price protection rebates between SBC and its supplier (Kolin), tooling deposits, and $140 million in accounts receivable. The complaint further characterized the misconduct as based on the SBC's filings with the Securities and Exchange Commission relating to the rebates, tooling deposits, and accounts receivables. Although the complaint alleged additional misrepresentations or omissions, they involved $40 million in accounts receivable from the same Chinese export–import company and SBC's statements from a meeting in February 2008, asserting that its 2006 and 2007 quarterly reports filed with the Securities and Exchange Commission were truthful and accurate when they were inaccurate. Indeed, Silver Point alleged in its complaint that the representations at the February 2008 meeting misrepresented SBC's financial condition by "restating and representing to Silver Point that SBC's revenue, cost of sales, gross margin, and operating income in SBC's [2007] quarterly reports . . . were truthful" when they "were not true for the same reasons described above regarding 'price protection' rebates, 'tooling deposit' cash advances, and $40 million of supposedly paid account receivables and $60 million in returns . . . ." These alleged misrepresentations thus did not take the Silver Point Action beyond the reach of Endorsement No. 25.

**¶25** Silver Point also contends that these new allegations formed separate "Claims" under the Federal Excess Policy. We disagree. The National Union Primary Policy defines "Claim" to mean, in relevant part, "a written demand for monetary, non-monetary or injunctive relief" or "a civil . . . proceeding for monetary, non-monetary or injunctive relief which

is commenced by . . . service of a complaint or similar pleading,"[4] and Silver Point admitted in its complaint that the *entire* Silver Point Action was "a 'Claim' as defined in the National Union [Primary] Policy." *See Armer v. Armer*, 105 Ariz. 284, 288 (1970) ("Parties are bound by their pleadings and evidence may not be introduced to contradict or disprove what has been admitted or asserted as fact in their pleadings . . . ."). The Silver Point Action thus constituted one Claim.

¶26 For these reasons, we find that the trial court did not err in dismissing Silver Point's claim under the Federal Excess Policy.

II. The Trial Court Correctly Granted Summary Judgment on Silver Point's Claim under the Federal Side A Policy

¶27 We review a grant of summary judgment de novo to determine whether any genuine issue of material fact exists, viewing the evidence and all reasonable inferences in the non-moving party's favor. *Russell Piccoli P.L.C. v. O'Donnell,* 237 Ariz. 43, 46-47, ¶ 10 (App. 2015). Summary judgment should be granted only "if the facts produced in support of [a] claim . . . have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim . . . ." *Orme Sch. v. Reeves,* 166 Ariz. 301, 309 (1990).

A. *Helme*'s Definition of "Related" Does Not Apply to the Federal Side A Policy

¶28 Silver Point first contends the trial court erred in granting Federal's motion based on the same *Helme* argument we reject above. Again, we look to the policy terms to determine whether the Silver Point Action and the Tsirekidze Action were "related." *See Gallegos*, 232 Ariz. at 129, ¶ 8 (stating that when a contract's terms have settled meanings, whether those terms are met raises a question of fact). The Federal Side A Policy defines "Related Claims" to include

all Claims for Wrongful Acts based upon, arising from, or in consequence of the same or related facts, circumstances,

---

[4] This definition is not meaningfully different from the definition of "claim" we have applied in other D&O policy cases. *See, e.g.*, *Nat'l Bank of Ariz. v. St. Paul Fire & Marine Ins. Co.*, 193 Ariz. 581, 584, ¶ 17 (App. 1999) ( "A claim is a demand for relief, payment, or something as a right, or as due.").

situations, transactions or events or the same or related series
of facts, circumstances, situations, transactions or events.

Section 7(c) states that "[a]ll Related Claims shall be treated as a single Claim first made on the date the earliest of such Related Claims was first made . . . regardless of whether such date is before or during the Policy Period." Again, the crux of the Silver Point Action was the same three categories of misrepresentations alleged in the Tsirekidze Action. The two cases thus arose from "the same or related series of facts" and were properly treated as Related Claims under the Federal Side A Policy.

**¶29** Silver Point again highlights those allegations it claims differ from those at issue in the Tsirekidze Action, including the $40 million payment allegedly due from SCHOT and those representations made after the Tsirekidze Action commenced. Silver Point offered no evidence that the new representations arose from facts not related to the Tsirekidze Action. Silver Point instead stood on the allegations of its complaint.[5]

**¶30** For these reasons, we agree with the trial court that "the plain language of [the Federal Side A Policy] relates the [Silver Point Action] back to the [Tsirekidze Action]."

      B.    The Prior or Pending Litigation Exclusion Did Not Create Coverage for the Silver Point Action

**¶31** Silver Point next points to the Federal Side A Policy's prior and pending litigation exclusion, which excludes coverage for any loss on account of any claim based upon, arising from, or in consequence of:

    (i)    any suit or other proceeding pending against, or order, decree or judgment entered for or against any Insured Person; or

---

[5] Silver Point also argued that it made "new loans" to SBC based on those February 2008 alleged misrepresentations. At oral argument on appeal, Silver Point pointed to its reply on its statement of facts to contend that new loans were made. Silver Point did present some evidence from the deposition of one of its officers that Silver Point made new loans to SBC in 2008 based on current representations regarding $40 million at the export-import company and the delivery of fifty to sixty million televisions from Kolin. Those "new loans" do not affect the result since they were based on restatements of the earlier representations rather than on facts not related to the Tsirekidze Action.

(ii)    any administrative or regulatory proceeding or investigation of which any Insured Person had notice;

on or prior to the Pending or Prior Date . . . or the same or substantially the same fact, circumstance or situation underlying or alleged therein[.]

The Pending or Prior Date identified in the policy is November 30, 2006. Silver Point contends this exclusion "trumps the general related-claims exclusion and requires Federal to provide coverage" because it did not exclude lawsuits filed in 2007, including the Tsirekidze Action. We review the application and validity of insurance policy exclusions de novo. *Nucor Corp. v. Emp'rs Ins. Co. of Wausau*, 231 Ariz. 411, 414, ¶ 8 (App. 2012).

¶**32**      As support, Silver Point cites *Gastar Exploration Ltd. v. U.S. Specialty Insurance Co.*, 412 S.W.3d 577 (Tex. Ct. App. 2013). Gastar sought coverage under a claims-made policy effective from November 1, 2008 to November 1, 2009 for a series of lawsuits beginning in 2006, seven of which were filed within the policy period. *Id*. at 579-81. The policy included a related claims exclusion and an endorsement establishing a prior or pending litigation date of May 31, 2000. *Id*. at 579-80. The latter clause excluded claims arising out of or based on facts similar to pending or prior litigation as of May 31, 2000, thus not excluding the suits at issue in *Gastar* which were filed in 2006 and later. *Id*. at 580-81, 588. The interrelated claims clause provided that if claims arose out of or were attributable to the same facts or related facts, the claims would be considered to be a single claim made at the time of the earliest claim. *Id.* at 580. The insurer argued that the claims filed after the start of the 2008-09 policy period were interrelated to the claims that were filed prior to the policy period in 2006 and thus excluded. *Id.* at 584.

¶**33**      The *Gastar* court found that the May 31, 2000 prior or pending litigation endorsement and related claims exclusion, when read together, created a conflict or an ambiguity:

[I]t is undisputed that the Seven Gastar Suits were filed during the Policy Period. The insurers argue the Seven Gastar Suits are related to Claims first made in 2006 and are therefore deemed to be a single Claim made at the time the earliest was made, which was well before the Policy Period. [The interrelated claims exclusion] would thus exclude coverage for the Seven Gastar Suits, while [the prior or pending litigation exclusion] would place them in the covered window

for Claims related to litigation filed after May 31, 2000, but
before the effective date of the policy.

*Id.* at 584.  The court interpreted the policy in Gastar's favor and found
coverage.  *Id.*

¶34          We decline to follow *Gastar* for two reasons.  First, the
Pending or Prior Date in the Federal Side A Policy was not created by
separate endorsement, as was the case in *Gastar*.  *See id.* at 586.  This is
significant because the *Gastar* court found that changing the prior or
pending litigation date by endorsement "demonstrate[d] the parties' intent
to restore coverage for Claims that arose out of the same facts as litigation
filed between May 31, 2000 and the inception date of the Policy."  *Id.*

¶35          Silver Point claims there was a similar intention in this case,
but the only evidence it offered was a November 14, 2007 Federal quote in
which the Pending or Prior Date was still "to be determined."
Approximately two weeks later, Federal sent SBC a coverage binder that
included the November 30, 2006 Pending or Prior Date.  There is nothing in
the record to suggest SBC and Federal discussed whether the Federal Side
A Policy would cover lawsuits related to the Tsirekidze Action in the
interim between the November 14, 2007 quote and the subsequent binder.

¶36          Second, the prior or pending litigation exclusion in *Gastar*
conflicted with the related claim provision, while the provisions here do not
conflict.  Thus, the court held that the two clauses conflicted because the
interrelated claim provision would render meaningless the prior and
pending litigation clause.  *Id.* at 584.  Thus, it concluded that the prior or
pending endorsement restored coverage that was in the original policy and
which had been excluded by the interrelated claims provision.  *Id.* at 585.

¶37          Here, in contrast, the two clauses do not conflict, but are
dealing with two different types of conditions.  The related clause provision
in combination with Section 7(c) provides that "[a]ll Related Claims shall
be treated as a single Claim first made on the date the earliest of such
Related Claims was first made . . . regardless of whether such date is before
or during the Policy Period," defining related claims as "Claims for
Wrongful Acts based upon, arising from, or in consequence of the same or
related facts, circumstances, situations, transactions or events or the same
or related series of facts, circumstances, situations, transactions or events."
Under that clause, the Silver Point claims were barred regardless of when
any related claim was filed. There simply was no coverage.  Independently
of that, the pending or prior claim exclusion barred a claim if it related to a

claim pending on November 30, 2006. The pending or prior claim exclusion thus was not trying to restore coverage which had been taken away by an endorsement, but acted independently of the Related Claim clause to exclude claims if they related to a claim pending on November 30, 2006. Each clause independently applied to different types of barred claims. The pending or prior exclusion, like any exclusion, is a limitation on coverage; it cannot create coverage that otherwise would not exist. *See, e.g.*, *Wisness v. Nodak Mut. Ins. Co.*, 806 N.W.2d 146, 151 (N.D. 2011) ("An exclusionary provision, or the absence of one, cannot be read to provide coverage that does not otherwise exist." (citation omitted)); *Md. Auto. Ins. Fund v. Baxter*, 973 A.2d 243, 252-53 (Md. Ct. Spec. App. 2009) ("[A] basic legal precept concerning insurance coverage is that exclusions do not create coverage."); *Elysian Inv. Grp. v. Stewart Title Guar. Co.*, 129 Cal. Rptr. 2d 372, 379 (Cal. Dist. Ct. App. 2002) (stating that insured "cannot rely upon an exclusion to coverage to extend coverage"); *Ray v. Valley Forge Ins. Co.*, 92 Cal. Rptr. 2d 473, 478 (Cal. Dist. Ct. App. 1999) ("Neither a policy exclusion nor a definition in a policy exclusion may create coverage."). We therefore reject Silver Point's contention that the Pending or Prior Date in the Federal Side A Policy created coverage for the Silver Point Action or created an ambiguity for purposes of summary judgment on whether the Silver Point claim was excluded from coverage under the Federal Side A Policy.

C. The Federal Side A Policy Did Not Defeat Silver Point's "Reasonable Expectations"

¶38 Insurance policy terms can violate "reasonable expectations" in the following situations:

1. Where the contract terms, although not ambiguous to the court, cannot be understood by the reasonably intelligent consumer who might check on his or her rights, the court will interpret them in light of the objective, reasonable expectations of the average insured;

2. Where the insured did not receive full and adequate notice of the term in question, and the provision is either unusual or unexpected, or one that emasculates apparent coverage;

3. Where some activity which can be reasonably attributed to the insurer would create an objective

impression of coverage in the mind of a reasonable insured;

4.      Where some activity reasonably attributable to the insurer has induced a particular insured reasonably to believe that he has coverage, although such coverage is expressly and unambiguously denied by the policy.

*First Am. Title Ins. Co. v. Action Acquisitions, LLC*, 218 Ariz. 394, 401, ¶ 33 (2008) (citation omitted). The evidence to support a reasonable expectations claim must be something "more than the fervent hope usually engendered by loss." *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 390 (1984).

**¶39**      Silver Point contends "the summary judgment evidence regarding the Tower 2 negotiation history establishes that any insured would have reasonably expected [the Federal Side A Policy] to cover the claims alleged in the Silver Point Action," thus focusing on the third and fourth circumstances listed above. But Silver Point did not identify anything Federal said or wrote that could have created an objective impression of coverage for claims related to the Tsirekidze Action. Silver Point also failed to show that SBC communicated any expectation of coverage for claims related to the Tsirekidze Action, or that SBC reasonably believed such coverage would exist.

**¶40**      Silver Point also argues the "amount of premiums charged is indicative of the breadth of coverage provided," but offered no evidence to suggest a connection between SBC's premium payments and presumed coverage for claims related to the Tsirekidze Action. Silver Point instead claims Federal should have told SBC that the Federal Side A Policy would not cover claims related to the Tsirekidze Action, citing a first-party bad faith case, *Nardelli v. Metropolitan Group Property & Casualty Insurance Co.*, 230 Ariz. 592 (App. 2012). In *Nardelli*, we stated that an insurer should not mislead its insured about the extent of coverage, but that it need not explain every provision without limitation. 230 Ariz. at 603, ¶ 54. Silver Point offered no evidence to show that Federal's explanation of the relevant policy terms—assuming one was given—was misleading or inaccurate. We therefore reject Silver Point's reasonable expectations claim.

        D.      The Silver Point Action Constituted One "Claim" Under the Federal Side A Policy

**¶41**      Silver Point also repeats its contention that the Silver Point Action comprised multiple "Claims" and that Federal should have

provided coverage for those allegations not repeated from the Tsirekidze Action. The Federal Side A Policy defines "Claim" to mean "a written demand for monetary damages or non-monetary relief against an Insured Person for a Wrongful Act" or "a civil . . . proceeding commenced by the service of a complaint or similar pleading . . . ." Simply put, Silver Point filed one civil proceeding, which constitutes one "Claim."

> E. Silver Point Cannot Raise New Policy Interpretations in its Reply Brief

**¶42** Finally, Silver Point argues for the first time in its reply brief on appeal that Section 8(b) of the Federal Side A Policy created an ambiguity as to when the Silver Point Action claim was "first made." An issue raised for the first time in the reply brief typically is waived, *Best v. Edwards*, 217 Ariz. 497, 504 n.7, ¶ 28 (App. 2008), but we may address the issue if it was argued by both sides below and raises an important point of law, *State v. Far W. Water & Sewer Inc.*, 224 Ariz. 173, 182 n.6, ¶ 14 (App. 2010). Silver Point did not raise Section 8(b) at any time before the trial court. We therefore decline to address it.[6] *See Ness v. W. Sec. Life Ins. Co.*, 174 Ariz. 497, 502 (App. 1992) ("[A]n issue raised for the first time in appellant's reply brief comes too late.").

---

[6] We note in passing Federal's separate motion to strike this argument, and deny it as moot. We briefly address Silver Point's argument in response to Federal's motion that it could raise Section 8(b) for the first time in reply under the "doctrine of completeness." This "doctrine" emanates from Arizona Rule of Evidence 106, which permits the introduction of other parts of a writing or recorded statement when the party-opponent introduces only parts of it. *State v. Dunlap*, 187 Ariz. 441, 454-55 (App. 1996). Here, we are concerned with Arizona Rule of Civil Appellate Procedure 13(c), not the rules of evidence. *See* ARCAP 13(c) ("If the appellant files a reply brief, it must be strictly confined to rebuttal of points made in the appellee's answering brief.").

**¶43**         For these reasons, we affirm the trial court's ruling granting summary judgment on Silver Point's claim under the Federal Side A Policy.[7]

III.    The Trial Court Did Not Abuse its Discretion in Awarding Federal Reasonable Attorneys' Fees

**¶44**         Silver Point also challenges the trial court's award of attorneys' fees to Federal under A.R.S. § 12-341.01(A). "We review the grant or denial of attorney fees for an abuse of discretion." *Motzer v. Escalante*, 228 Ariz. 295, 296, ¶ 4 (App. 2011).  We will not disturb the trial court's ruling unless it lacks any reasonable basis.  *Rowland v. Great States Ins. Co.*, 199 Ariz. 577, 587, ¶ 31 (App. 2001).

**¶45**         Silver Point argues the trial court should not have awarded any attorneys' fees based on three factors from *Associated Indemnity Corp. v. Warner*, 143 Ariz. 567 (1985).[8]  Silver Point first argues the trial court should not have awarded fees because Silver Point supported its positions with "published [Arizona] Supreme Court authority," namely, *Helme*.   As discussed above, *Helme* is not controlling in this case.  *See supra* ¶ 18.

---

[7] Given our conclusions above, we need not address Federal's contention that the prior notice exclusions (Section 4(d) of the National Union Primary Policy and Section 4(a) of the Federal Side A Policy) independently barred coverage for the Silver Point Action or Federal's contention that the stipulated judgment against SBC was invalid under *United Services Automobile Association v. Morris*, 154 Ariz. 113 (1987), and its progeny.

[8] The complete list of factors include: (1) whether the unsuccessful party's position or defense had merit, (2) whether the litigation could have been avoided or settled and how the successful party's efforts influenced the result, (3) whether "assessing fees against the unsuccessful party would cause an extreme hardship," (4) whether the successful party prevailed with respect to all of the relief sought, (5) whether the legal question at issue was novel, (6) "whether such claim or defense had previously been adjudicated in this jurisdiction," and (7) whether the particular award "would discourage other parties with tenable claims or defenses from litigating or defending legitimate contract issues for fear of incurring liability for substantial amounts of attorney's fees."  *Warner*, 143 Ariz. at 570.

¶46 Silver Point next argues Federal was not entitled to fees because this case involved a "novel legal issue," citing *Rowland*. In *Rowland*, we affirmed a trial court's decision to deny attorneys' fees because the case raised a novel question of law. 199 Ariz. at 587, ¶ 32. Here, however, the trial court made an award of reasonable attorneys' fees, and the trial court distinguished Silver Point's "novel issue" which, again, was its reliance on *Helme*. *See Indian Vill. Shopping Ctr. Inv. Co. v. Kroger Co.*, 175 Ariz. 122, 125 (App. 1993) ("We decline to hold that the trial court abused its discretion in awarding attorneys' fees simply because, as Indian Village argues, the case raises a new or novel issue in this jurisdiction.").

¶47 Silver Point's last contention is that the award "creates a chilling effect on legitimate claims by an insured against an insurance company." There is nothing in the record to suggest the trial court's fee award would discourage future insureds from litigating coverage disputes.

¶48 Finally, we note the *Warner* factors are intended to assess the reasonableness of an attorneys' fee request, not preclude an entire award where the prevailing party has shown entitlement to fees. *See Sanborn v. Brooker & Wake Prop. Mgmt., Inc.*, 178 Ariz. 425, 430 (App. 1994) (stating that the *Warner* factors "are not a guide for deciding who is the prevailing party but rather are intended 'to assist the trial judge in determining whether attorney's fees should be granted . . . *once eligibility has been established.*'" (alteration in original) (citation omitted)). The trial court awarded Federal only forty percent of its requested fees. Silver Point does not contend the amount of this reduction was unreasonable.

¶49 For these reasons, we affirm the trial court's attorneys' fee award. We also find that Federal is the prevailing party on appeal and is entitled to recover reasonable attorneys' fees and taxable costs incurred on

appeal contingent upon its compliance with Arizona Rule of Civil Appellate Procedure 21.

## CONCLUSION

**¶50** We affirm the trial court's rulings and award reasonable attorneys' fees and taxable costs to Federal.



Ruth A. Willingham · Clerk of the Court
FILED: ama